IN THE UNITED STATES DISTRICT COURT
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| **JUDITH B. STOER,** *as personal representative of the Estate of Eric Stoer,* | * |
| Plaintiff, | * |
| v. | Case No.: GJH-17-03203 |
| | * |
| **VW CREDIT, INC.,** *et al.*, | * |
| Defendants. | * |
| | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

Plaintiff Judith B. Stoer, Personal Representative of the Estate of Eric Stoer, brings this civil action against Defendants Volkswagen Group of America, Inc. ("VWGoA") and VW Credit, Inc. ("VCI") (collectively "Defendants") alleging violations of the Fair Credit Reporting Act ("FRCA"), 15 U.S.C. §§ 1681 *et seq.* (Counts I and III), civil liability for willful noncompliance (Count IV), and civil liability for negligent noncompliance (Count V) arising from the financing agreement that her husband, Eric Stoer, entered into with VWGoA to purchase a 2014 Passat Sedan for their daughter. Pending before the Court is Defendants' Motion for Summary Judgment, ECF No. 64. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the following reasons, Defendants' Motion for Summary Judgment, ECF No. 64, is granted.

I. BACKGROUND[1]

A. Factual Background

On December 30, 2013, Plaintiff's husband, Eric Stoer, entered into a retail installment sale contract (the "Contract") to finance the purchase of a 2014 Volkswagen Passat. ECF No. 64-3 ¶ 5 (Affidavit of Matthew Birmingham); ECF No. 64-3 at 14–15[2] (copy of Contract). The Contract was assigned to VCI, for which VCI opened an account ending in 0103 (the "Account"), and the Contract required Mr. Stoer to make 60 monthly payments totaling $558.47 beginning on February 13, 2014 and reoccurring on the same date every month thereafter. ECF No. 64-3 at 3 ¶¶ 6–7.

At the time of the purchase of the vehicle, VCI sent Mr. Stoer a welcome packet entitled "Welcome to the family – A guide to your new Volkswagen Credit account" (the "Welcome Packet"). *Id*. at 4 ¶ 8; ECF No. 64-3 at 17–28 (copy of Welcome Packet). The Welcome Packet advised Mr. Stoer that he could make payments on the Account through (1) recurring automatic monthly payments, (2) one-time payments through the VCI customer portal called "My Account," (3) a one-time or recurring payment through a bank's bill pay system, (5) a one-time payment over the phone, or (6) by mailing a check. ECF No. 64-3 at 24; ECF No. 64-3 at 4 ¶ 9. The Welcome Packet also stated that: "We do not accept debit and credit cards as a form of monthly payment." ECF No. 64-3 at 24. Additionally, on each account statement in sections entitled "Payment Options," and "Other Payment Options," VCI advised Mr. Stoer of the

---

[1] These facts are either undisputed or viewed in the light most favorable to Plaintiff as the non-moving party.

[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

2

accepted payment methods. *Id.* at 4 ¶ 10; ECF No. 64-3 at 32–44; ECF No. 64-5 at 2 ¶ 5(a) (Affidavit of Peter Duhig).

On October 25, 2016, Judge Charles R. Breyer of the United States District Court for the Northern District of California approved a consumer class action settlement in *In re: Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. 3:15-MD-2672, 2016 WL 6824450 (N.D. Cal. Oct. 25, 2016), which involved "2.0 Liter Volkswagen and Audi branded turbocharged direct injection ("TDI") vehicles," ECF No. 64-4 at 4 ¶ 7. On October 27, 2016, Mr. Stoer registered the 2014 Volkswagen Passat to participate in the "2.0 Liter TDI Settlement" with VWGoA, though VCI was not a party to this settlement. ECF No. 64-4 at 4 ¶¶ 7–8, 10–11 (Affidavit of Bonnie Gelfusa); ECF No. 65-2 at 6 (record of Mr. Stoer's registration for TDI Settlement).

To determine eligibility for the 2.0 Liter TDI Settlement, a customer who purchased or leased an affected vehicle had to log on to the VW Court Settlement Website (www.VWCourtSettlement.com) and initiate the registration by entering both the vehicle VIN and milage in order to see the expected value of the vehicle and the customer's restitution payment, if any. ECF No. 64-4 ¶ 8. On November 30, 2016, after Mr. Stoer provided the required documentation, VWGoA validated his eligibility to participate in the 2.0 Liter TDI Settlement. ECF No. 64-4 at 5 ¶ 14; ECF No. 65-2 at 4. Then, on December 12, 2016, VWGoA created a buyback agreement and release offer letter (the "Buyback Agreement"), and two days later, VWGoA published the Buyback Agreement to Mr. Stoer through its online claim portal. ECF No. 64-4 at 5 ¶ 15; ECF No. 65-2 at 3–4. On December 18, 2016, Mr. Stoer signed and submitted the Buyback Agreement, however, after speaking with a VWGoA representative, he resubmitted the Buyback Agreement on December 20, 2016. ECF No. 64-4 at 5 ¶ 16; ECF No.

65-2 at 3; ECF No. 64-4 at 12–18 (copy of signed Buyback Agreement). VWGoA validated this Buyback Agreement on December 20, 2016, as well. ECF No. 64-4 at 5 ¶ 17; ECF No. 65-2 at 2. In this Buyback Agreement, which Mr. Stoer signed, he agreed that he was "expected to continue to make [his] loan payments until [he] accept[ed] [VWGoA's] offer, schedule[d] an appointment, and complete[d] [his] remedy." ECF No. 64-4 at 6 ¶ 20; *id.* at 12, 15. Mr. Stoer scheduled his buyback appointment for February 17, 2017 at 1:30pm at Antwerpen Volkswagen. ECF No. 65-2 at 2; ECF No. 64-4 at 6 ¶ 21. The vehicle was returned on that date. ECF No. 65-2 at 2; ECF No. 64-4 at 6 ¶ 22.

As part of the 2.0 Liter TDI Settlement, VWGoA offered Mr. Stoer the "Volkswagen of American 2.0L TDI Customer Goodwill Package" (the "Goodwill Package"), which included a $500 dealership card and a $500 Volkswagen Prepaid Visa Loyalty Card ("Visa Card"). ECF No. 64-4 at 7 ¶ 26. In order to accept this Goodwill Package, Mr. Stoer agreed to the Goodwill Package Program Rules. ECF No. 64-4 at 7 ¶ 27; *id.* at 20–22 (copy of Volkswagen of American 2.0L TDI Customer Goodwill Package Program Rules). The Goodwill Package Program Rules provided that "[i]n order to use the $500 Volkswagen Prepaid Visa Loyalty Card and $500 Volkswagen Dealership Card, you must accept the terms of the respective Cardholder Agreements provided for your reference on this website." ECF No. 64-4 at 21; *id.* at 7 ¶ 28. The Volkswagen Prepaid Visa Loyalty Card Cardholder Agreement stated that "You may use your Card to purchase goods or services wherever Visa and NYCE Cards are accepted as long as you do not exceed the value available on the Card." ECF No. 64-4 at 24 (copy of Volkswagen Prepaid Visa Loyalty Card Cardholder Agreement); *id.* at 7 ¶ 29. Defendants contend that VWGoA "never advised Mr. Stoer that he could use the Visa card to make payments to his lender." *Id.* ¶ 30.

On December 11, 2016, VCI's Activity Log indicated the receipt of a check from Mr. Stoer for $58.47 in addition to a $500 VW Visa Card, but VCI only applied the check for $58.47 towards Mr. Stoer's December 2016 payment because "VCI does not accept credit cards, debit cards, or gift cards as method[s] of payment," therefore "VCI was unable to apply the Visa Card towards the balance owed on the December 2016 monthly payment." ECF No. 64-3 at 6 ¶¶ 20–21; *id.* at 47 (VCI Activity Log of receipt and credit of $58.47 payment on the Account ending in 0301); *id.* at 35 (copy of the Account statement with attached Visa Debit Card). On January 2, 2017, VCI's Activity Log indicated that it sent Mr. Stoer a delinquency letter regarding the past due balance on the December 2016 payment. ECF No. 65 at 6 (VCI Activity Log showing delinquency letter was sent on January 2, 2017); ECF No. 64-3 at 6 ¶ 23. Then, on January 17, 2017, VCI's Activity Log showed that Mr. Stoer called VCI and was advised by a VCI employee that the Account was "35 days delinquent with an outstanding balance of $1083.47." ECF No. 65 at 5; ECF No. 64-3 at 7 ¶ 29. Additionally, Mr. Stoer stated that he provided a check for $58.47 and sent in a copy of the "$500 VOA CREDIT CARD." ECF No. 65 at 5; ECF No. 64-3 at 6 ¶ 25. The VCI Activity Log noted that Mr. Stoer was advised that the $500 was "not [sent] in a way that we can process by our system" and that "we don't accept credit card," and that Mr. Stoer stated that he "may take his credit hit and not pay us." *Id.* The VCI representative then explained that the credit reporting occurred in "30 day increments . . . so [January could] go 30+ and [December could] go 60+" if he failed to correct the delinquent payment. *Id.*

On January 20, 2017, VCI's Activity Log indicated that it received a written dispute from Mr. Stoer regarding VCI's credit reporting about Mr. Stoer's December 2016 payment. ECF No. 64-3 at 9 ¶ 41; ECF No. 65 at 4. The same day, a VCI representative noted on the VCI Activity Log that "[c]urrent payment for [December 2016] invoice +30dd," meaning that the December

5

2016 payment was 30 days delinquent and, therefore, the representative "verified [this with] AUD," or the "Automated Universal Dataform" ("AUD"), by processing an AUD with an "account status" of 71 (30-59 days past due) and indicating that the December 2016 payment was "38DD" or 38 days delinquent. ECF No. 65 at 4; ECF No. 64-3 at 9 ¶ 42; *see also* ECF No. 65-1 at 2–14 (copy of VCI's Fair Credit Reporting Act Policy: Furnishing and Disputes). VCI's Activity Log also noted "NO DEROGS YET REPORTING." *Id.* On January 22, 2017, VCI received a check payment from Mr. Stoer totaling $558.47. ECF No. 64-3 at 7 ¶ 26; ECF No. 64-3 at 47. VCI then applied $500 towards the past due December 2016 payment and the remaining $58.47 towards the January 2017 payment, which left $500 remaining on the January 2017 bill. ECF No. 64-3 at 7 ¶ 26. On February 15, 2017, a VCI employee spoke with Mr. Stoer and advised him that the account was over 33 days delinquent, ECF No. 64-3 at 7 ¶ 29; ECF No. 65 at 3. On February 20, 2017, VCI's Activity Log confirmed that the vehicle was turned in on February 17, 2017, and VCI placed the Account in "Protected Status" which "stopped late charge assessment, stopped credit reporting on the Account, and stopped all outgoing calls and correspondences" to Mr. Stoer. ECF No. 65 at 3; ECF No. 64-3 at 7 ¶ 30.

On March 15, 2017, VCI received a check from VWGoA totaling $14,386.69 to pay off the Account, and on March 23, 2017, VCI confirmed receipt of the payoff amount to Mr. Stoer. ECF No. 64-3 at 47; *id.* at 8 ¶ 32. On March 31, 2017, VCI's Activity Log noted that VCI received an Automated Credit Dispute Verification ("ACDV") from TransUnion related to the Account and "[i]n accordance with VCI's policies and procedures" a VCI employee "investigated the dispute" and verified that Mr. Stoer sent in the Visa Card and a check for $58.47 as his December 2016 payment, and the employee confirmed that the December 2016 payment "had been paid over 30 days late" because the Visa Card was not an "accepted method

6

of payment." ECF No. 65 at 2; ECF No. 64-3 at 10 ¶ 46. The VCI Activity Log from the same date also indicated that VCI responded to TransUnion with an ACDV, which "verified derogs [sic] listed in eoscar [sic] only," and reflected that "Plaintiff's December 2016 payment was over 30 days past due," and, therefore, that "VCI's reporting was accurate." ECF No. 65 at 2; ECF No. 64-3 at 10 ¶ 47. VCI did not receive any other ACDV's from the credit reporting agencies ("CRAs") regarding the Account. *Id.* ¶ 48.

Finally, on July 3, 2017, VCI's Activity Log reflected that it received another direct dispute from Mr. Stoer's counsel, Peter Axelrad, and a VCI employee investigated the dispute and recorded on the log that VCI "received [a] personal check for [December] 2016 payment of $58.47, but VW Gift Card not an acceptable form of payment so December payment shorted by $500 and payment made on January 22nd, 2017 of $558.47 was partially applied to December invoice." ECF No. 65 at 2; ECF No. 64-3 at 10 ¶ 49. VCI then submitted an AUD to verify the Account as "paid or closed account/zero balance," closed the Account on March 15, 2017, and verified that the December 2016 and January 2017 payments were both 30 days past due. ECF No. 64-3 at 11 ¶ 50; ECF No. 65 at 2.

### B. Procedural Background

Then-Plaintiff, Eric Stoer, filed a Complaint in this Court on October 31, 2017, ECF No. 1, and amended the Complaint on January 2, 2018, ECF No. 11. On July 26, 2018, the Court granted Defendants' Motion to Dismiss Count II of the Amended Complaint, ECF No. 15 at 7, finding that Plaintiff's defamation claim was preempted by the FCRA, and the Court dismissed Plaintiff's claim for defamation, ECF No. 16. On February 8, 2019, the Court granted Plaintiff's Motion for Leave to File Second Amended Complaint, ECF Nos. 25 & 26. In the Second Amended Complaint, Plaintiff alleges violations of the FCRA (Counts I and III), civil liability

for willful noncompliance of the FCRA (Count IV), and civil liability for negligent noncompliance with the FCRA (Count V). ECF No. 27. Plaintiff seeks actual damages in excess of $75,000, punitive damages in excess of $1,000,000.00, the entry of an order "directing Defendants to perform their statutory duties," pre- and post-judgment interest, costs, and attorneys' fees. *Id.* On September 3, 2019, Judith Stoer, Personal Representative of Eric Stoer's Estate, was substituted as the Plaintiff in this case, in light of Mr. Stoer's passing. ECF No. 33. On December 3, 2021, Defendants filed the now pending Motion for Summary Judgment, ECF No. 64, which Plaintiff opposed on January 3, 2022, ECF No. 70. Defendants replied on January 18, 2022, ECF No. 71.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate if "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c), show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322–23. A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if sufficient evidence

favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings, to fulfill its "affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citation omitted). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

### III. DISCUSSION

Plaintiff's core allegation is that Defendants inaccurately reported that Mr. Stoer was delinquent on his VCI account to the CRAs, which negatively impacted his credit and ability to secure a home equity line of credit ("HELOC"). *See* ECF No. 27. Defendants argue that there is no dispute of material fact and that "Plaintiff cannot establish a claim under the FCRA as to either VWGoA or VCI" such that they are entitled to summary judgment because (1) "VWGoA is not a furnisher of credit and did not report any information to the CRAs" related to the Account, (2) VCI "accurately reported Mr. Stoer's delinquency to the CRAs," (3) VCI conducted a reasonable investigation when it received Mr. Stoer's credit dispute from TransUnion, and (4) Plaintiff "has not and cannot establish by admissible evidence that Mr. Stoer suffered any damages, including the purportedly denied home equity line of credit ("HELOC")." ECF No. 64-1 at 8–9.

In response, Plaintiff concedes that (1) VWGoA is not a furnisher of information and, therefore, cannot be held liable for a violation of the FRCA and (2) she does not have the right to

9

bring a claim under 15 U.S.C. § 1681s-2(a) against either Defendant. ECF No. 70 at 15. Thus, summary judgment will be granted in favor of Defendant VWGoA on all claims and in favor of both Defendants on claims in Count I under 15 U.S.C. § 1681s-2(a). Plaintiff maintains her claims in Counts III–V of the Second Amended Complaint.

"Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Saunders v. Branch Banking And Tr. Co. Of VA*, 526 F.3d 142, 147 (4th Cir. 2008) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 127 S.Ct. 2201, 2205–06, 167 L.Ed.2d 1045 (2007)). "The FCRA creates a private right of action allowing injured consumers to recover 'any actual damages' caused by negligent violations and both actual and punitive damages for willful noncompliance." *Robinson v. Equifax Info. Servs.*, LLC, 560 F.3d 235, 239 (4th Cir. 2009); *see also* 15 U.S.C. §§ 1681n, 1681o. As relevant in the instant case, the FCRA imposes duties on "furnishers of information" to credit reporting agencies. 15 U.S.C. § 1681s–2. Furnishers of information have several affirmative obligations under the FCRA, all of which are aimed at ensuring the CRAs are provided complete and accurate information. *Id.* There is no dispute here that Defendant VCI is a furnisher and, therefore, it is subject to the requirements set forth in Section 1681s–2. ECF No. 64-3 at 8 ¶ 35.

The FCRA imposes two sets of duties on furnishers of information to the CRAs. The first set of duties is set forth at 15 U.S.C. § 1681s–2(a). Under Section 1681s–2(a), the FCRA prohibits any person from furnishing information to a CRA if he or she knows or "has reasonable cause to believe that the information is inaccurate." § 1681s-2(a)(1)(A). It also requires that any person covered by this provision correct any information provided to a CRA that is determined to not be complete and accurate. § 1681s–2(a)(2); *see also Saunders*, 526 F.3d at 148. The second set of duties imposed on furnishers under the FCRA is set forth in Section 1681s–2(b).

Section 1681s–2(b) "is triggered when a consumer disputes the accuracy of a furnisher's report and the CRA, in turn, notifies the furnisher of the dispute." *Johnson v. Cap. One*, No. 18-cv-02102-PWG, 2019 WL 1936147, at *4 (D. Md. Apr. 30, 2019) (citing *Saunders*, 526 F.3d at 148 (citing 15 U.S.C. § 1681i(a)(2))). Upon receipt of this notice, a furnisher must:

> (A) conduct an investigation with respect to the disputed information;
>
> (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;
>
> (C) report the results of the investigation to the consumer reporting agency; [and]
>
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis[.]

§ 1681s–2(b)(1); *see also Saunders*, 526 F.3d at 148.

In interpreting the investigative duties of a furnisher under the FCRA, the Fourth Circuit has held that "§ 1681s–2(b)(1) requires creditors, after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified." *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004). Here, VCI's Activity Logs reflect that, as early as January 20, 2017, Mr. Stoer contacted VCI directly to dispute its credit reporting related to his December 2016 payment, ECF No. 64-3 at 9 ¶ 41; ECF No. 65 at 4, and that Mr. Stoer sent additional dispute letters on January 26, February 4, February 20, March 2, and March 5, 2017, ECF No. 64-3 at 10 ¶ 44; ECF No. 65 at 3,[3] and that VCI eventually received an ACDV from a CRA,

---

[3] A notice of disputed information provided directly to a furnisher by a consumer does not trigger a furnisher's duties under Section 1681s–2(b). *See Alston v. United Collections Bureau, Inc.*, No. 13-cv-0913-DKC, 2014 WL 859013, at *7 n.3 (D. Md. Mar. 4, 2014); *see also Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1154 (9th Cir. 2009) ("These duties arise only after the furnisher receives notice of dispute from a CRA; notice of a dispute received directly from the consumer does not trigger furnishers' duties under subsection (b).").

specifically from TransUnion, on March 31, 2017, which then triggered Defendant VCI's duty to investigate. *See* ECF No. 64-3 at 10 ¶ 46; ECF No. 65 at 2.

"[T]he plain meaning of 'investigation' clearly requires some degree of careful inquiry[.]" *Johnson*, 357 F.3d at 430. "The furnisher's investigation must be reasonable 'to determine whether the disputed information can be verified.'" *Alston v. United Collections Bureau, Inc.*, No. 13-cv-0913-DKC, 2014 WL 859013, at *7 (D. Md. Mar. 4, 2014) (quoting *Johnson*, 357 F.3d at 431). The Fourth Circuit has opined that in determining the reasonableness of an investigation, "the cost of verifying disputed information" must be weighed "against the possible harm to the consumer." *Johnson*, 357 F.3d at 432. The question of whether a defendant's investigation is reasonable is a fact-intensive inquiry typically reserved for trial, and "[s]ummary judgment is proper only if the 'reasonableness of the defendant's procedures is beyond question and if the plaintiff has failed to adduce evidence that would tend to prove the investigation was unreasonable.'" *Davenport v. Sallie Mae, Inc.*, 124 F. Supp. 3d 574, 581 (D. Md.), *aff'd*, 623 F. App'x 94 (4th Cir. 2015) (quoting *Alston v. United Collections Bur., Inc.*, 2014 WL 859013, at *6 (D. Md. Mar. 4, 2014)); *see also Jianqing Wu v. Trans Union*, No. 03-cv-1290-CIV-AW, 2006 WL 4729755, at *8 (D. Md. May 2, 2006), *aff'd sub nom. Jianqing Wu v. Equifax*, 219 F. App'x 320 (4th Cir. 2007).

Plaintiff asserts that (1) Defendants "performed a quick, sloppy, and superficial response, which consisted of nothing more than merely verifying identification information and/or the presence of a loan," (2) "Defendants should have sought to verify that [Mr. Stoer] did indeed miss said payments," (3) "[h]ad Defendants performed their statutory obligations . . . they would have discovered that Plaintiff had not missed any payments… [and] had paid in each payment in full by their respective due dates" and (4) "they would have reported the correct information to

12

the Credit Reporting Agencies, including TransUnion, Equifax, and Credit Karma." ECF No. 27 ¶¶ 60 – 63. Plaintiff additionally asserts that Defendants' failure to conduct a proper investigation in response to Mr. Stoer's dispute is both a willful and negligent violation of the FCRA. *Id.* ¶¶ 67– 68, 71–72.

The undisputed facts establish the opposite. Defendants have produced documents, affidavits, and deposition transcript testimony to establish that its investigation of Mr. Stoer's disputed late payments was reasonable, and that Mr. Stoer's late payments were accurately reported to the CRAs, and Plaintiff fails to raise any genuine dispute of material fact as to these issues. *See Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009) ("The pertinent question is thus whether the furnisher's procedures were reasonable in light of what it learned about the nature of the dispute from the description in the . . . notice of dispute.").

Defendant VCI conducted an investigation after receiving an ACDV from TransUnion on March 31, 2017, which Defendant VCI attests is the only ACDV it received from the CRAs regarding the Account. ECF No. 64-3 at 10 ¶¶ 46, 48. Defendant VCI submits an affidavit from Matthew Birmingham, a Manager Customer Service Operations at VCI, in which Mr. Birmingham outlines the procedures VCI uses to investigate consumer disputes from CRAs. Specifically, VCI, as a furnisher of information, is registered with a system called e-OSCAR to receive consumer credit history disputes from the CRAs to which it reports: Equifax, TransUnion, Experian, and Innovis,[4] and e-OSCAR provides VCI with an ACDV after it receives a consumer dispute to one of the CRAs. *Id.* ¶¶ 35–36. Mr. Birmingham attests that, upon receipt of an ACDV from a CRA, VCI's policy and procedures require, in accordance with its

---

[4] Though not material, Defendant VCI attests that it furnishes credit information only to Equifax, TransUnion, Experian, and Innovis, ECF No. 64-3 at 10 ¶ 35, while Plaintiff, in the Second Amended Complaint, alleges that Defendants reported information to CRAs including TransUnion, Equifax, and CreditKarma, *see* ECF No. 27 ¶ 63.

13

"FCRA Policy: Furnishing and Disputes," ECF No. 65-1 at 2–14 (copy of "FCRA Policy"), that it investigate the dispute by "conduct[ing] a thorough audit of the account to ensure accuracy of reporting, review[ing] all relevant information the consumer submitted to the CRAs related to the dispute, [and] complet[ing] its investigation of the dispute and respond[ing] to the indirect dispute via e-OSCAR.." ECF No. 64-3 at 9 ¶ 38; ECF No. 65-1 at 8. And with respect to the March 31, 2017, ACDV that it received from TransUnion related to the Account, he further attests that a VCI employee "investigated the dispute and verified that [Mr. Stoer] sent in the Visa Card and a check for $58.47 as his December 2016 payment." ECF No. 64-3 at 10 ¶ 46; *id.* at 35. And because "the Visa Card was not an accepted method of payment," Mr. Birmingham further attests that the VCI employee "confirmed that the December 2016 payment had been paid over 30 days late and that VCI's reporting was accurate." *Id.* ¶ 46. Following the investigation, the VCI employee then submitted an ACDV to TransUnion, recording on the Activity Log: "verified derogs [sic] listed in eoscar [sic] only," which, according to Mr. Birmingham, reflects that Plaintiff's December 2016 payment was, indeed, over 30 days past due. *Id.* ¶ 47; ECF No. 65 at 2.

The burden of showing the investigation was unreasonable is on the plaintiff. *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 37 (1st Cir. 2010). Plaintiff contends that the investigation was not reasonable because Defendant VCI did not consider all relevant information, including: (1) Mr. Stoer's "exemplary payment history," (2) "the fact that VCI knew it would be reimbursed for the car in full under the buyback agreement," (3) that Mr. Stoer "believed in good faith that he had timely paid the December bill," and (4) that "the problem with the December 2016 payment was a fluke based on Mr. Stoer's misunderstanding of acceptable payment methods." ECF No. 70 at 13 ¶¶ 27–28; *id.* at 11 ¶¶ 18–19. These arguments

fail because even if accepted, none change the fact that Mr. Stoer did not make the December 2016 payment through an acceptable method.

First, Mr. Stoer's "exemplary" payment history leading up until his missed December 2016 payment is not relevant to the issue of whether Defendant VCI reasonably investigated the disputed December 2016 payment at issue, and Plaintiff has not provided any evidence or case law suggesting that a "reasonable" investigation requires Defendant VCI to consider this information.

Next, Plaintiff's argument that Defendant VCI "knew it would be reimbursed" after Mr. Stoer returned the car under the buyback program, in addition to being of marginal relevance to whether Mr. Stoer's payment was late, is plainly contradicted by evidence in the record. In his affidavit, Mr. Birmingham states that "VCI was not a party to the 2.0 Liter TDI Settlement and was not required to service or report accounts affected by that settlement differently to the CRAs." ECF No. 64-3 at 9 ¶ 40. That Defendant VCI was not a party to the Settlement or privy to which customers were involved is further supported by Mr. Birmingham's deposition testimony in which he stated that: "[w]e, VCI, would have had no knowledge of the state of the buyback program, whether or not this customer was involved in it. That's not information we would have had." ECF No. 70-1 at 43:16–44:8. Additionally, Defendant VWGoA also submits an affidavit from Bonnie Gelfusa, a Customer Resolution & Retention Team Lead at Volkswagen Group of America, who also attests that VCI was not a party to the 2.0 Liter TDI Settlement. ECF No. 64-4 at 4 ¶ 7. Plaintiff puts forth no evidence to contradict Defendants' affidavits or testimony, and, therefore, Plaintiff cannot manufacture a dispute of fact. Indeed, Plaintiff's argument is further refuted by Ms. Gelfusa's statement that, under the Buyback Agreement, Plaintiff agreed that he was "expected to continue to make [his] loan payments until

15

[he] accept[ed] [VWGoA's] offer, schedule[d] an appointment, and complete[d] [his] remedy," ECF No. 64-4 at 6 ¶ 20, with the remedy being the return of the car to the dealership. Therefore, the fact that Defendant VCI would, at some point, be fully repaid upon the return of the car, does not negate the missed payment and does not create a genuine dispute of material fact because Mr. Stoer remained responsible for making his monthly payments, through accepted payment methods, until the car was returned.

Finally, the record reveals that Mr. Stoer was on notice of the acceptable methods of payment on the Account, and his attempt to use the $500 Visa Card for partial payment on the December 2016 bill, whether characterized as a "fluke" or "misunderstanding," was not acceptable. *See* ECF No. 70 at 13 ¶¶ 27–28. Additionally, Plaintiff provides no support for her contention that if Mr. Stoer's belief "in good faith that he had made timely payments" was taken into consideration when Defendant VCI reported the result of its investigation to TransUnion, then "[he] would not have been penalized." *See* ECF No. 70 at 19.

The evidence in the record demonstrates that Mr. Stoer was previously notified of the acceptable methods of payments long before he attempted to use the $500 Visa Card as part of his December 2016 payment. Mr. Birmingham stated that at the time the vehicle was purchased, VCI sent Mr. Stoer the Welcome Packet, which, although located in a footnote, stated "[w]e do not accept debit and credit cards as a form of monthly payment." ECF No. 64-3 at 4 ¶ 8; *id.* at 24. Thereafter, on each monthly statement, Mr. Stoer was notified of the various accepted forms of payments under the headings "Payment Options" and "Other Payment Options," neither of which include payment via debit or credit card as an accepted method. *Id.* at 36–37, 43–44; *id.* at 4 ¶ 10. Nonetheless, Plaintiff attempts to create a dispute of fact as to whether Mr. Stoer knew or understood that he could not make his monthly payment with a debit or credit card, but each

16

attempt fails because there is no dispute the information was provided to him. *See CoStar Realty Info., Inc. v. Field*, 612 F. Supp. 2d 660, 669 (D. Md. 2009) (noting that the "failure to read an enforceable online agreement, as with any binding contract, will not excuse compliance with its terms.").

On March 31, 2017, when Defendant VCI received the ACDV from TransUnion related to its reporting on the Account, and it investigated this dispute, its verification that Mr. Stoer sent in an unaccepted form of payment in the $500 Visa Card, along with a check totaling $58.47, accurately reflected that December 2016 payment was over thirty days delinquent when it was finally paid on January 22, 2017. ECF No. 64-3 at 10 ¶¶ 46–47, 26; ECF No. 65 at 2. On this day, Mr. Stoer paid $500.47, $500 of which was applied to the outstanding December 2016 payment, and the remaining $58.47 was applied to the January 2017 payment, which left a $500 balance remaining for the January 2017 payment. ECF No. 64-3 at ¶¶ 26–29. Because the car was returned to the dealership on February 17, 2021, Defendant VCI "ceased further credit reporting on the Account pending VWGoA's payoff on March 15, 2017." *Id.* at ¶ 30. In short, Defendant VCI's reporting of the delinquent payments was accurate.

Based upon a full review of the record, the information that Defendant VCI provided to the CRAs regarding Mr. Stoer's delinquent December 2016 payment was accurate, and this Court finds that it has "discharged its duty to perform a reasonable investigation," *Jianqing Wu*, 2006 WL 4729755, at *9; *see also Alston v. Wells Fargo Home Mortg.*, No. 13-cv-3147-TDC, 2016 WL 816733, at *10 (D. Md. Feb. 26, 2016) (citing *Chiang*, 595 F.3d at 37). Thus, Plaintiff's contention that Defendant VCI violated Section 1681s-2(b) of the FCRA by failing to conduct a reasonable investigation fails as a matter of law, and Defendant VCI is entitled to

summary judgment on Count III.[5] Because Plaintiff's claim for a violation of Section 1681s-2(b) based on the failure to conduct a reasonable investigation fails, so too must her claims for civil liability for willful and negligent noncompliance based on the same. Therefore, Defendant VCI is likewise entitled to summary judgment on Counts IV and V.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment, ECF No. 64, is granted. A separate Order shall issue.

Date: May 4, 2022

/s/
GEORGE J. HAZEL
United States District Judge

---

[5] Because this Court grants summary judgment in favor of Defendant VCI on Plaintiff's claim that it violated Section 1681s-2(b), the Court need not address the issue of whether Plaintiff's alleged damages were caused by Defendant VCI.